# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:13-cr-00106-JCM-PAL |
| | ) | |
| Plaintiff, | ) | **REPORT OF FINDINGS AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | (Mtn to Suppress - Dkt. #23) |
| JAMES GARNER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on Defendant James Garner's ("Garner") Motion to Suppress Evidence for Fourth Amendment Violation (Dkt. #23), which was referred to the undersigned for a Report of Findings and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule IB 1-4. The court has considered the Motion (Dkt. #23), the government's Response (Dkt. #25), the testimony adduced at an evidentiary hearing held on October 1, 2013, and the arguments of counsel at the hearing. Christina Silva appeared on behalf of the government. Paul Riddle appeared on behalf of Garner who was present in custody.

## BACKGROUND

On March 20, 2013, a federal grand jury returned an Indictment (Dkt. #1) against Garner, charging him with one count of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment arises out of a March 5, 2013, arrest by officers of the Las Vegas Metropolitan Police Department ("LVMPD"). An initial appearance and arraignment and plea was held March 22, 2013. Counsel was appointed, Garner pled not guilty and was detained pending trial after a detention hearing. *See* Minutes of Proceedings (Dkt. #10) and Order of Detention (Dkt. #12). Trial is currently scheduled for November 4, 2013.

/ / /

/ / /

**DISCUSSION**

**I.      The Parties' Positions.**

Garner's Motion to Suppress argues that he was seized without reasonable suspicion when officers approached him in the parking lot of his apartment complex.  In his written motion, and in oral argument following the evidentiary hearing, Garner maintains that his initial contact with the officers was an immediate seizure not based on reasonable suspicion.  As a result, Garner's Fourth Amendment rights were violated when the officers patted him down and discovered the firearm involved in this prosecution.  The court should therefore suppress all tangible evidence against Garner seized as a result of this contact.

The government opposes the motion asserting that the initial contact was not a seizure.  Rather, the officers merely approached Garner, who was seated in a vehicle, after receiving a call for assistance from another officer regarding a suspect who had fled on foot.  The response claims that two LVMPD officers observed a suspicious vehicle parked in an alley behind 2801 W. Sahara in Las Vegas, Nevada. A person, later identified as Garner, was seated in the driver's seat wearing dark clothing that matched the description of clothing worn by the person who had fled from the other officer requesting assistance. As a result, Officer Bowman activated his emergency lights and walked towards Garner's yellow Chrysler PT Cruiser.  As Officer Bowman approached the vehicle he observed the driver reach for the front of his waist, which caused him concern for his personal safety.  Bowman directed the occupant to show his hands and exit the vehicle.  Bowman's partner, Officer Valle, conducted a pat down which revealed an object in the middle of Garner's waistband which he recognized as the handle of a small frame handgun.  Garner verbally identified himself.  A records check revealed he had prior felony convictions, and the officers arrested him for felon in possession of a firearm.  A search of his person incident to arrest revealed six baggies of a green leafy substance consistent with the odor of marijuana officers observed when approaching the vehicle.

The government argues that under the totality of the circumstances, the officers had reasonable suspicion to conduct an investigatory detention, and that Garner's furtive movement constituted reasonable suspicion that he was armed which justified the pat down and recovery of the firearm.  The government disputes that Garner's initial contact with Officer Bowman was a seizure.  The written

1   response asserts that Garner's Fourth Amendment rights were not violated when the officers merely

2   approached his vehicle to determine if Garner was willing to talk to the officers.  The government relies

3   on a line of Supreme Court cases holding that police questioning alone does not constitute a seizure.

4   The government acknowledges that Officer Bowman activated the lights on his police vehicle before

5   approaching Garner, and that this is a factor the court may consider as a show of authority.  However,

6   the government contends that activating emergency lights "is not dispositive of whether a seizure has

7   occurred."

8   **II.     Testimony**

9   At the evidentiary hearing the government called the two officers involved in this stop, Bowman

10  and Valle.  The government rested and defense counsel requested an opportunity to discuss whether his

11  client wished to testify.  A recess was taken for this purpose.  The court canvassed Garner who

12  acknowledged that he understood he had the right to testify or not and indicated that after discussing the

13  matter with his counsel, it was his decision not to testify.  The defense rested and the court took the

14  matter under submission for preparation of a written report and recommendation.

15  **A.     Testimony of Officer Bowman.**

16  Officer Bowman has been an officer with the LVMPD for six years.  He was on patrol with his

17  partner, Valle, on March 5, 2013, at night when he received a call to assist an officer concerning a

18  subject who had run from the fellow officer, Tolbert.  The subject was described as a black male

19  wearing dark clothing.  Bowman and Valle went to the Siegel Suites on Teddy and Sahara in Las Vegas

20  entering a parking lot in the alley behind the complex.  The Siegel Suites is approximately four-tenths

21  of a mile from the area of Teddy and Wyandotte where Tolbert requested assistance because a

22  suspicious person that had run from him.  Bowman and Valle were in a marked patrol car and in

23  uniform patrolling and looking for the subject who ran from Tolbert.  While going through the alley

24  Bowman observed an individual seated in a vehicle who was "slumped down like he didn't want us to

25  see."  This made Bowman curious.  The vehicle was parked in a parking spot backed in with the driver

26  facing the alley.  The officers were using their vehicle spotlight to patrol the alley and had a clear view

27  of the individual inside the vehicle.  The officers activated their emergency lights and pulled the patrol

28  / / /

3

1   car near Garner's  vehicle.  Both officers immediately "jumped out fast and made contact" with the

2   occupant, later identified as Garner.

3       Bowman testified that the Siegel Suites is a high crime area known for narcotics and

4   prostitution.  Whenever someone tries to avoid police contact, it puts officers on "high alert".  Both

5   officers tried to make contact with Garner.  The spotlight was on Garner when Bowman identified

6   himself and asked if he could speak with Garner.  As Bowman approached Garner, Bowman saw his

7   hand reach from the area of his face towards his waistband.  Bowman was less than five to six feet away

8   and "closing the distance fast."  When he observed Garner drop his hands, Bowman drew his weapon

9   and ordered Garner to show his hands.  Both officers ordered Garner to open the door of his vehicle.

10  Valle flanked Garner on the passenger side as Bowman approached on the driver's side.  Garner got out

11  of the vehicle while Bowman "was still on gun."  Valle walked over to Garner and patted him down

12  finding a weapon.

13      Bowman testified that when he and his partner were patrolling the alley looking for the running

14  suspect, they were using the patrol vehicle's spotlight.  When they observed Garner in the vehicle, they

15  activated their emergency lights.  When the patrol vehicle stopped and the officers jumped out, the

16  patrol car was parked in front of Garner's vehicle, partially blocking the front end of Garner's car.

17      On cross-examination, Bowman testified that the officer who made the call for assistance was

18  another member of his squad, Officer Tolbert.  The call that came over the police radio was that Tolbert

19  was in pursuit of someone who had run from him.  Tolbert gave a vague description of a black male in

20  dark clothing.

21      In preparation for his testimony, Bowman pulled up a CAD (computer assisted dispatch) report

22  relating to his response to Tolbert's call for assistance.  The only information Bowman had before

23  making contact with Garner was that somebody had run from Tolbert a few minutes prior

24  approximately four-tenths of a mile away from where Garner was sitting in his vehicle.  Bowman and

25  Valle immediately drove to the Siegel Suites area and drove to the back alley.  They entered the alley

26  from the west and were slowly driving east when they first saw Garner sitting in his car.  Bowman

27  reiterated that they were using the spotlight on the vehicle as they went down the alley, and activated

28  the emergency lights on the patrol car when they saw Garner in the vehicle slump down.  The spotlight

1   was trained on Garner.  The emergency lights were activated to let everyone in the area know that the

2   officers were there in a police car on police business.

3        The patrol car was parked at an angle to Garner's vehicle.  Although it would not have been

4   impossible for Garner to leave in his vehicle, it would have been difficult.  Bowman testified that he

5   made it clear to Garner that Bowman wanted to talk to him.  Garner was not free to leave.  Bowman

6   was detaining Garner until Bowman made contact with him.  Bowman did not recall whether Garner

7   was sweaty or out of breath like he had been running when the initial contact was made.

8        **B.      Testimony of Officer Valle.**

9        Officer Valle has been a patrol officer with LVMPD for six years.  He came into contact with

10  Garner on March 5, 2013, behind the Siegel Suites off Sahara.  Valle first observed Garner inside a

11  vehicle.  He believed it was a silver PT Cruiser.  While driving down the alley in a marked patrol

12  vehicle and in uniform Garner appeared to observe the officers and "lowered his body down as if trying

13  to avoid contact with us."  Garner lowered his body after Valle shined the patrol vehicle spotlight on

14  him.  The spotlight was used because he was responding to a call to assist an officer in a foot pursuit

15  nearby.  He believed it was close to midnight when he came into contact with Garner.  The alley was

16  very dark.  The officers entered the alley from the west, driving east, looking through vehicles to see if

17  they could find the subject who had run from Tolbert.  Officer Tolbert put out a call over the radio that

18  a black male wearing dark clothing had run from him in the area of Teddy and Alcoa.

19       Garner's vehicle was parked facing away from the building.  Valle pulled the patrol car near the

20  passenger headlight of Garner's car. Both officers got out of the vehicle and approached.  The patrol car

21  did not completely block Garner's car, but Garner would have had to maneuver to get around the police

22  car.  The patrol car lights were activated before the officers got out of the car to make the public aware

23  that the officers were conducting police business in the area.  Bowman approached from the driver's

24  side, and Valle approached from the passenger side.  Something alerted Bowman.  Valle concluded

25  Bowman saw something because Bowman's voice got louder and he started giving Garner commands.

26  Bowman yelled "let me see your hands, let me see your hands."

27       Valle testified that his "alarm was starting going up too" as the officers approached Garner

28  because "something changed about how Bowman was approaching" the situation.  Bowman ordered

1    Garner out of the car.  Garner complied.  Valle went behind Garner to position him for a pat down.

2    Bowman directed Valle to handcuff Garner.  During the pat down, Valle felt the handle of a semi-

3    automatic weapon in Garner's front waistband near the groin area.

4         Bowman drew his weapon when Bowman started ordering Garner.  Everything happened pretty

5    quickly.  Valle did not draw his weapon because he "was thinking I was going to go hands on."  Valle

6    explained that he expected to take Garner into custody and did not draw his weapon so that he had his

7    hands free if he needed to handcuff Garner.  The area where the stop occurred is a high crime area.

8         On cross-examination, Valle reiterated that the call for assistance came from the area of Alcoa

9    and Teddy, or possibly Wyandotte.  He did not recall where he and Bowman were when they got the

10   call.  He estimated that it took one to two minutes to arrive to the area behind the Siegel Suites where

11   the stop was made.  He agreed that Tolbert's call for assistance involved a person running four-tenths of

12   a mile away.  When he first observed Garner, he could not tell whether Garner had been running.  When

13   he first observed Garner, he could not see the details of what Garner was wearing.  The alley area is

14   narrow and Valle would have been only a couple of feet from Garner's car.  He just observed a black

15   male in the vehicle.  He did not know if Garner was the same person who ran from Officer Tolbert.

16   The information that dispatch put out was a "code red" of an officer in foot pursuit.

17        Tolbert did not respond to the scene of this stop.  Garner was stopped because the officers saw

18   him slump down. Valle agreed that Garner was not free to leave while the officers were trying to make

19   contact with him.  Valle did not see Garner make any movement after Garner slumped down in the

20   vehicle.

21   **III.    Applicable Law & Analysis.**

22        The Fourth Amendment secures "the right of the people to be secure in their persons, houses,

23   papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Fourth

24   Amendment protects reasonable and legitimate expectations of privacy.  *Katz v. United States*, 389 U.S.

25   347 (1967).  The Fourth Amendment protects "people, not places."  *Id.*  Evidence obtained in violation

26   of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the

27   poisonous tree."  *Wong Sun v. United States*, 371 U.S. 471 (1963)**.**

28   / / /

1    For Fourth Amendment purposes, a seizure of a person occurs when a law enforcement officer

2 in some way restricts the liberty of a citizen, either by physical force or show of authority. *Florida v.*

3 *Bostick*, 501 U.S. 429, 434 (1991). A citizen's liberty is restrained if, "taking into account all of the

4 circumstances surrounding the encounter, the police conduct would have 'communicated to a

5 reasonable person that he was not at liberty to ignore the police presence and go about his business.'"

6 *Id*., at 437 (quoting *California v. HodariD.,* 499 U.S. 621, 628 (1991)). In determining whether an

7 individual has been seized for Fourth Amendment purposes, the court must consider the totality of all

8 the circumstances surrounding the encounter. *United States v. Drayton*, 536 U.S. 194 (2002). The

9 reasonable person test is an objective one and "presupposes an *innocent* person." *Id*., at 202 (quoting

10 *Bostick*, 501 U.S. at 437-38) (emphasis in original). Merely approaching individuals on the street or in

11 other public places and "putting questions to them if they are willing to listen" does not violate the

12 Fourth Amendment. *Id*. A consensual encounter does not trigger Fourth Amendment scrutiny.

13    In this case, the government's written motion argues that Bowman's attempt to approach and

14 question Garner did not constitute a seizure. The government relies on a line of cases in which the

15 Supreme Court has held that police questioning alone does not constitute a seizure. *See, e.g., Florida v.*

16 *Royer*, 460 U.S. 491 (1983) (plurality opinion). It is clear, and the court finds, that this was not a

17 consensual encounter. Bowman and Valle were shining their patrol vehicle spotlight down the alley

18 and focused on Garner when they observed him seated in his car. The spotlight remained on him while

19 the officers immediately pulled their patrol car to the front of Gardner's vehicle parking at an angle near

20 the front headlight of Garner's vehicle. The officers activated the patrol vehicle's emergency lights and

21 immediately got out of the vehicle approaching Garner's vehicle on both sides. Although both officers

22 testified Garner's vehicle was not completely blocked in by the patrol vehicle, both acknowledged that

23 Garner would have had to maneuver his own vehicle to get around the patrol car. More importantly,

24 Both Bowman and Valle testified that from the point of the initial encounter, Garner was not free to

25 ignore the police presence and go about his business. Rather, both Bowman and Valle acknowledged

26 that Garner was being detained. Bowman testified that Garner was not free to leave and that he was

27 being detained until Bowman made contact with him. Valle also testified that from the point the patrol

28 / / /

1   car pulled up at an angle near the front headlight of Garner's vehicle, Garner was not free to leave.  The

2   court finds that Garner was seized in an investigatory detention.

3          The Fourth Amendment's prohibition against unreasonable searches and seizures extends to

4   brief investigatory stops of persons or vehicles that fall short of an arrest.  *United States v. Arvizu*, 534

5   U.S. 266, 273 (2002).  An investigatory detention requires reasonable suspicion that criminal activity

6   may be afoot.  *Id*.  Reasonable suspicion is a "narrowly drawn exception to the probable cause

7   requirement of the Fourth Amendment."  *Terry v. Ohio*, 392 U.S. 1, 26 (1968).  The police may stop an

8   individual reasonably suspected of criminal activity, question him briefly, and perform a limited pat-

9   down search for weapons.  *Id*. at 22-24.  An investigatory detention balances law enforcement's need to

10  search and seize against the personal invasion which the search or seizure entails.  *Id*. at 21 (quoting

11  *Camara v. Mun. Ct.,* 387 U.S. 523, 534 (1967)).  Under this balancing approach, important

12  governmental interests justify a brief investigatory detention on less than probable cause.  *Terry*, 392

13  U.S. at 21.

14         Law enforcement officers may initiate an investigatory detention only if they have reasonable,

15  articulable suspicion of criminal activity.  *Id*. at 21-22.  The government must point to specific and

16  articulable facts, together with rational inferences drawn from those facts, that reasonably suggests

17  criminal activity has occurred or is imminent.  *Id*.  A law enforcement officer who makes observations

18  which reasonably lead him to suspect that a particular person has committed, is committing, or is about

19  to commit a crime, may detain that person briefly in order to investigate the officer's suspicions.

20  *Berkemer v. McCarty,* 468 U.S. 420, 439 (1994).

21         Inarticulable hunches or generalized suspicions are insufficient.  *Ybarra v. Illinois*, 444 U.S. 85,

22  92-93 (1979).  Courts must look at the totality of the circumstances in each case to determine whether a

23  detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.  *Arvizu*,

24  534 U.S. at 272.  Investigating officers are entitled to draw on their training and experience "to make

25  inferences from and deductions about the cumulative information available to them that 'might well

26  elude an untrained person.'"  *Id*. at 272.  The Supreme Court has recognized that "the concept of

27  reasonable suspicion is somewhat abstract."  *Id*.  The Fourth Amendment is satisfied if the officer's

28  action is supported by reasonable suspicion to believe that criminal activity may be afoot, and

8

1  observations and factors that are by themselves consistent with innocence may collectively amount to

2  reasonable suspicion. *Id*. at 273 (internal quotation and citations omitted).

3        "The quantum of proof needed for reasonable suspicion is less than a preponderance of

4  evidence, and less than probable cause." *United States v. Tiong,* 224 F.3d 1136, 1140 (9th Cir. 2000).

5  A stop may be founded on reasonable suspicion despite a possible innocent explanation for every police

6  observation. *Id.* Additionally, courts examining whether reasonable suspicion supports a stop should

7  not view each factor in isolation or give no weight to factors for which an innocent explanation may

8  exist. *Arvizu,* 534 U.S. at 275-76.

9        Examining the totality of the circumstances, the court finds that the officers lacked reasonable

10  suspicion that Garner was engaged in any criminal activity.  The only articulable basis for initiating

11  contact with Garner was that a black male wearing dark clothing had fled Officer Tolbert approximately

12  four-tenths of a mile from where Garner was seated in his vehicle behind his apartment complex.

13  Garner was observed sitting in the driver's side of his vehicle as the officers drove down the alley

14  shining their spotlight.  The only suspicious activity either officer observed before the decision was

15  made to detain Garner was that Garner slumped down as if trying to avoid police contact.  The court

16  found both officers credible that Garner did, indeed, slump down as the officers shined their spotlight

17  on him.  However, this observation in and of itself is simply insufficient to support reasonable suspicion

18  that Garner was engaged in any criminal activity.  The court also found both officers credible that the

19  area of the Siegel Suites Apartment is a high crime area known for drugs and prostitution.  However,

20  (1) a black man sitting in a parked car, (2) parked legally behind an apartment complex , (3) in a high

21  crime area, (4) four-tenths of a mile away from where a black man had run from a fellow officer, (5)

22  who slumps down in his vehicle when police shine a spotlight on him, is not an objective basis for

23  suspecting legal wrongdoing.

24        The court fully appreciates that experienced police officers may draw reasonable conclusions

25  that criminal activity is afoot based on their training and experience.  The court also appreciates that

26  experienced police officers are entitled to draw on their training and experience and draw conclusions

27  that something criminal is occurring despite a possible innocent explanation.  However, the court finds

28  that the officers in this case lacked a particularized and objective basis for suspecting that Garner was

engaged in any legal wrongdoing.  Of course, as it turns out, the officers' generalized suspicions that Garner may be engaged in criminal activity proved correct.  However, a law enforcement officer must have more than a hunch or general suspicion that someone who does not want to have contact with him is committing, has committed, or is about to commit a crime.  A search and seizure is never justified by what it uncovers.   Under the Fourth Amendment, a search and seizure must be justified from its inception.  The court finds that Garner was seized in violation of the Fourth Amendment, and evidence seized from the pat down and subsequent search of his person incident to his arrest must therefore be suppressed under the fruit of the poisonous tree doctrine.

For these reasons,

**IT IS RECOMMENDED** that Garner's Motion to Suppress (Dkt. #23) be **GRANTED**.

Dated this 22nd day of October, 2013.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE